MARRA v. SAN JACINTO & P. V. IRR. DIST. et al. (two cases).

(Circuit Court, S. D. California, S. D. April 27, 1904.)

Nos. 1,086, 1,087.

1. IRRIGATION DISTRICTS—BONDS—PAYMENT—REMEDIES—MANDAMUS—RECEIVER.
Act Cal. March 7, 1887, p. 29, c. 34, as amended by Act March 20, 1891, p. 142, c. 127, providing for the organization of irrigation districts, authorizes such districts to issue bonds for the construction of necessary works; and section 17 (page 37) provides that the bonds and interest thereon shall be paid by revenue derived from an annual assessment upon the real property of the district, and that all real property therein shall be and remain liable to be assessed for such payment as provided in the act. *Held,* that where an irrigation district, duly organized, issued and sold bonds under such act, the remedy of a holder thereof, after having recovered judgment and securing a return of an execution against the property of the district unsatisfied, was to compel the officers of the district by mandamus to levy an assessment against the property of the district, and not by a suit in equity for the appointment of a receiver.

The following is the opinion of Circuit Judge ROSS on an application for leave to intervene in the suit in equity, as hereinafter referred to:

The oral application made on behalf of the California Cattle Company to intervene in this suit in equity is denied, without prejudice to another application of a similar nature based upon a proper showing. The bill, I think, presents a proper cause for the appointment of a receiver of the property of the defendant corporation. If it be true that the complainant is a bona fide owner of valid bonds issued by the defendant irrigation district, while acting as such under the laws of the state, and that property acquired and owned by it is in the hands of strangers, holding and claiming the same adversely, a failure to appoint a receiver may result in depriving the complainant of rights to which he may be entitled; whereas, if it shall be hereafter found, upon proper judicial inquiry, that the alleged rights of the complainant are not well founded, the parties in the possession of such property may very readily be protected.

A receiver will therefore be appointed in case No. 1,087, upon the execution of a bond by the complainant, with sufficient sureties, to be approved by the court, in the sum of $10,000, as security for the costs of the receivership. The parties in interest may suggest for the consideration of the court some proper person for the position.

John G. North and John W. Lane, for complainant.
Geo. J. Denis and Frank W. Burnett, for defendants.

ROSS, Circuit Judge. A consideration of the objections made to the proposed order of appointment of a receiver and a further consideration of the bill of complaint in this cause satisfies me that the court was in error in its ruling made and entered on the 28th day of March, 1904, providing for such an appointment.

On the 7th of March, 1887, the Legislature of California passed an act entitled "An act to provide for the organization and government of irrigation districts, and to provide for the acquisition of water and other property, and for the distribution of water thereby for irrigation purposes" (St. Cal. 1887, p. 29, c. 34), which was amended and supple-

¶ 1. Mandamus to enforce payment of judgment against municipality, see note to Holt County v. National Life Ins. Co. of Montpelier, Vt., 25 C. C. A. 475.

mented by subsequent acts (St. 1889, pp. 15, 18, 212, 213, cc. 19, 20, 178; St. 1891, pp. 53, 142, 145, 147, 244, cc. 57, 127, 128, 171).

The first section of the act of 1887, as amended by that of March 20, 1891, provides that whenever 50 or a majority of the holders of title or evidence of title to land susceptible of one mode of irrigation from a common source, and by the same system of works, desire to provide for the irrigation of the same, they may propose the organization of a district under the provisions of the act, and when so organized such district shall have the powers conferred or that may thereafter be conferred by law upon such irrigation districts. The equalized county assessment roll next preceding the presentation of the petition for the organization of the irrigation district under the provisions of the act, it is declared, shall be sufficient evidence of title for the purposes of the act.

Its second section, as amended by the act of March 20, 1891, is as follows:

"A petition shall first be presented to the board of supervisors of the county in which the lands, or the greatest portion thereof, is situated, signed by the required number of holders of title, or evidence of title, of such proposed district, evidenced as above provided, which petition shall set forth and particularly describe the proposed boundaries of the district, and shall pray that the same may be organized under the provisions of this act. The petitioners must accompany the petition with a good and sufficient bond, to be approved by the said board of supervisors, in double the amount of the probable cost of organizing such district, conditioned that the bondsmen will pay all the said costs in case said organization shall not be effected. Such petition shall be presented at a regular meeting of the said board, and shall be published for at least two weeks before the time at which the same is to be presented, in some newspaper printed and published in the county where said petition is presented, together with a notice stating the time of the meeting at which the same will be presented; and if any portion of such proposed district lie within another county, or counties, then said petition and notice shall be published in a newspaper published in each of said counties. When such petition is presented, the said board of supervisors shall hear the same and may adjourn such hearing from time to time, not exceeding four weeks in all; and on the final hearing may make such changes in the proposed boundaries as they may find to be proper, and shall establish and define such boundaries: provided, that said board shall not modify said boundaries so as to except from the operation of this act any territory within the boundaries of the district proposed by said petitioners which is susceptible of irrigation by the same system of works applicable to the other lands in such proposed district; nor shall any lands which will not, in the judgment of said board, be benefited by irrigation by said system be included within such district: provided, that any person whose lands are susceptible of irrigation from the same source may, in the discretion of the board, upon application of the owner to said board, have such lands included in said district. Said board shall also make an order dividing said district into five divisions, as nearly equal in size as may be practicable, which shall be numbered first, second, third, fourth, and fifth, and one director, who shall be a free-holder in the division, and an elector and resident of the district, shall be elected by each division: provided, that if a majority of the holders of title or evidence of title, evidenced as above provided, petition for the formation of a district, the board of supervisors may, if so requested in the petition, order that there may be either three or five directors, as said board may order, for such district, and that they may be elected by the district at large. Said board of supervisors shall then give notice of an election to be held in such proposed district, for the purpose of determining whether or not the same shall be organized under the provisions of this act. Such notice shall describe the boundaries so established, and shall designate a name for such proposed district, and said notice shall be published for at least three weeks prior to such election

in a newspaper published within said county; and if any portion of such proposed district lie within another county or counties. then said notice shall be published in a newspaper published within each of said counties. Such notice shall require the electors to cast ballots, which shall contain the words 'Irrigation District—Yes,' or 'Irrigation District—No,' or words equivalent thereto, and also the names of persons to be voted for to fill the various elective offices hereinafter prescribed. No person shall be entitled to vote at any election held under the provisions of this act, unless he shall possess all the qualifications required of electors under the general election laws of this state."

The third section provides how such election shall be conducted, and for the canvass of the vote, and that if, upon such canvass, it appear that at least two-thirds of all the votes cast are "Irrigation District—Yes," the board of supervisors shall, by an order entered upon its minutes, declare such territory duly organized as an irrigation district under the name and style theretofore designated, and shall declare the persons receiving respectively the highest number of votes for the several offices to be duly elected thereto, and shall cause a certified copy of such order to be immediately filed for record in the office of the county recorder of each county in which any portion of such land is situated, and shall also immediately forward a copy thereof to the clerk of the board of supervisors of each of the counties in which any portion of the district may lie; and from and after the date of such filing the organization of such district shall be complete, and the officers thereof shall be entitled to enter immediately upon the duties of their respective offices upon qualifying according to law, and shall hold such offices, respectively, until their successors are elected and qualified. The third section of the act, as amended by that of March 20, 1891, also provides that "no action shall be commenced or maintained, or defense made, affecting the validity of the organization unless the same shall have been commenced or made within two years from the making of said order" of the board of supervisors declaring the territory duly organized as an irrigation district. Section 4 et seq. provide for subsequent elections, at which an assessor, a collector, a treasurer, and a board of directors for the district shall be elected. Section 11, as amended March 20, 1891, provides for the organization of the board of directors after their election; and by section 12, as so amended, it is provided that the board shall, among other things, have the right to enter upon any of the land to make surveys, and may locate the necessary irrigation works and the line for any canal or canals, and the necessary branches for the same, on any of the lands which may be deemed best for such location; and shall also have the right to acquire, either by purchase, condemnation, or other legal means, lands, waters, water rights, and other property necessary for the construction, use, supply, maintenance, repair, and improvements of said canal or canals and works, including canals and works constructed by private owners, land for reservoirs for the storage of needful waters, and all necessary appurtenances, and may also construct the necessary dams, reservoirs, and works for the collection of water for the district, and do any and every lawful act necessary to be done that sufficient water may be furnished to each landowner in the district for irrigation purposes. And it is declared by the twelfth section of the act, as so amended, that the use of all water required for the irrigation of the

lands of any district formed under the provisions of the act, together with the rights of way for canals and ditches, sites for reservoirs, and all other property required in fully carrying out the provisions of the act, is a public use, subject to the regulation and control of the state in the manner prescribed by law. By section 13 it is provided that the legal title to all property acquired under the provisions of the act shall vest in such irrigation district, and shall be held by such district in trust for the uses and purposes therein set forth; and the board of directors is authorized to hold, use, acquire, manage, occupy, and possess the property as provided in the act. By section 15 of the amendatory act of March 20, 1891, it is provided that for the purpose of constructing necessary irrigating canals and works, and acquiring the necessary property and rights therefor, and otherwise carrying out the provisions of the act, the board of directors of such district must, as soon after such district has been organized as may be practicable, and whenever thereafter the construction fund has been exhausted by expenditures authorized therefrom, and the board deem it necessary or expedient to raise additional money for such purposes, estimate and determine the amount of money necessary to be raised, and shall immediately thereafter call a special election at which shall be submitted to the electors of the district possessing the qualifications prescribed by the act, the question whether or not the bonds of the district shall be issued in the amount so determined. Notice of such election is required to be given, and such notices are required to specify the time of holding the election and the amount of bonds proposed to be issued; and, in the event a majority of the votes cast at the election are favorable to the issuance of the bonds, the board of directors are required to immediately cause them to be issued, such bonds to be payable in gold coin of the United States, in 10 series, as follows, to wit: At the expiration of 11 years, 5 per cent. of the whole number of said bonds; at the expiration of 12 years, 6 per cent.; at the expiration of 13 years, 7 per cent.; at the expiration of 14 years, 8 per cent.; at the expiration of 15 years, 9 per cent.; at the expiration of 16 years, 10 per cent.; at the expiration of 17 years, 11 per cent.; at the expiration of 18 years, 13 per cent.; at the expiration of 19 years, 15 per cent.; at the expiration of 20 years, 16 per cent.—all of which bonds shall bear interest at the rate of 6 per cent. per annum, payable semiannually on the 1st days of January and July of each year. Section 16 provides for the sale of the bonds by the board of directors from time to time, in such quantities as may be necessary and most advantageous, to raise money for the construction of the canals and works, the acquisition of property and rights, and otherwise to fully carry out the objects and purposes of the act. Notice of such sale is required to be given, and bids therefor received, but with the provision that in no event shall the board sell the bonds for less than 90 per cent. of the face value thereof. By section 17 it is provided that the bonds and interest thereon shall be paid by revenue derived from an annual assessment upon the real property of the district; and all the real property in the district, it is declared, shall be and remain liable to be assessed for such payment, as provided in the act. Provision is made, for the assessment of all such real property annually by the assessor. By section 20 it is

provided that on or before the first Monday in August of each year the assessor must complete his assessment book, and deliver it to the secretary of the board of directors, who must immediately give notice thereof and of the time the board of directors, acting as a board of equalization will meet to equalize assessments, by publication in a newspaper published in each of the counties comprising the district. The time fixed for the meeting shall not be less than 20 nor more than 30 days from the first publication of the notice, and in the meantime the assessment book is required to remain in the office of the secretary for the inspection of all persons interested. Section 21 is as follows:

"Upon the day specified in the notice required by the preceding section for the meeting, the board of directors, which is hereby constituted a board of equalization for that purpose, shall meet and continue in session from day to day, as long as may be necessary, not to exceed ten days, exclusive of Sundays, to hear and determine such objections to the valuation and assessment as may come before them; and the board may change the valuation as may be just. The secretary of the board shall be present during its sessions and note all changes made in the valuation of property, and in the names of the persons whose property is assessed; and within ten days after the close of the session he shall have the total values, as finally equalized by the board, extended into columns and added."

Section 22, as amended by the act of March 20, 1891, is as follows:

"The board of directors shall then levy an assessment sufficient to raise the annual interest on the outstanding bonds, and at the expiration of ten years after the issuing of bonds of any issue must increase said assessment to an amount sufficient to raise a sum sufficient to pay the principal of the outstanding bonds as they mature. The secretary of the board must compute and enter in a separate column of the assessment book the respective sums, in dollars and cents, to be paid as an assessment on the property therein enumerated. When collected, the assessment shall be paid into the district treasury, and shall constitute a special fund, to be called the 'Bond Fund of ——— Irrigation District.' In case of the neglect or refusal of the board of directors to cause such assessment and levy to be made as in this act provided, then the assessment of property made by the county assessor and the state board of equalization shall be adopted, and shall be the basis of assessments for the district, and the board of supervisors of the county in which the office of the board of directors is situated shall cause an assessment roll for said district to be prepared, and shall make the levy required by this act, in the same manner and with like effect as if the same had been made by said board of directors, and all expenses incident thereto shall be borne by such district. In case of the neglect or refusal of the collector or treasurer of the district to perform the duties imposed by law, then the tax collector and treasurer of the county in which the office of the board of directors is situated must, respectively, perform such duties, and shall be accountable therefor upon their official bonds as in other cases."

By section 23 of the act, as amended by the act of March 20, 1891, the assessment upon real property is made a lien against the property assessed from and after the first Monday in March for any year, and such lien is not removed until the assessments are paid, or the property sold for the payment thereof. Subsequent sections of the act provide that, in the event the assessments become delinquent, the property shall be sold to pay such assessments, and in the event the property so sold is not redeemed within 12 months from the sale the collector or his successor in office is required to make to the purchaser or his assignee a deed to the property, which deed, duly acknowledged or proved, is (except as against actual fraud) made conclusive evidence

of the regularity of all the proceedings from the assessment by the assessor, inclusive, up to the execution of the deed, which deed, the statute declares, conveys to the grantee the absolute title to the lands described therein, free of all incumbrances, except when the land is owned by the United States or this state, in which case it is prima facie evidence of the right of possession.

The act of March 16, 1889, provides for a special proceeding in the superior court of the county in which the lands of the district, or some portion thereof, are situated by the board of directors of the irrigation district organized under the act of March 7, 1887, "in and by which the proceedings of said board and of said district, providing for and authorizing the issue and sale of the bonds of said district, whether said bonds or any of them have or have not been sold, may be judicially examined, approved, and confirmed." Sections 3 and 4 of the act of March 16, 1889, provide for notice of the proceedings, and for the hearing of any person interested in the district, or in the issue or sale of the bonds, and section 5 of the act declares:

"Upon the hearing of such special proceedings, the court shall have power and jurisdiction to examine and determine the legality and validity of, and approve and confirm, each and all of the proceedings for the organization of said district under the provisions of the said act, from and including the petition for the organization of the district, and all other proceedings which may affect the legality or validity of said bonds, and the order for the sale, and the sale thereof. The court, in inquiring into the regularity, legality, or correctness of said proceedings, must disregard any error, irregularity, or omission which does not affect the substantial rights of the parties to said special proceeding; and it may approve and confirm such proceedings in part, and disapprove and declare illegal or invalid other and subsequent parts of the proceedings. The court shall find and determine whether the notice of the filing of said petition has been duly given and published, for the time and in the manner in this act prescribed. The costs of the special proceedings may be allowed and apportioned between all the parties, in the discretion of the court."

The bill in the present suit alleges, among other things: That the defendant San Jacinto & Pleasant Valley Irrigation District is, and ever since the 3d day of April, 1891, has been, a corporation duly organized and existing under and in accordance with the provisions of the act of March 7, 1887, and of the acts amendatory thereof. That the defendants McEuen and Haslam are, and for more than four years last past have been, duly elected and qualified members of the board of directors of said corporation; and that the defendant Johnson is, and for the same period has been, the duly qualified and acting secretary thereof. That at the time of the election of the defendants McEuen and Haslam as such directors there were also elected as directors of the corporation C. M. Diedrich, J. G. Gingery, and A. A. Lord, who also duly qualified as such directors, and entered upon the duties of their office, and that thereupon the defendants McEuen and Haslam, together with the said Diedrich and Gingery and Lord, constituted the duly elected, qualified, and acting board of directors of the district. That no other persons have been elected or appointed as such directors, and that the said Diedrich, Gingery, and Lord have removed out of the district, and their office thereafter became vacant, which vacancies have not been filled by appointment or otherwise. That on or about July 1, 1892, the defendant corporation was duly authorized

by vote of the qualified voters of the district, at an election duly called and held, to issue certain bonds of the district; and that thereafter, and before the issuance of the bonds, to wit, on the 6th day of May, 1892, the board of directors of the defendant corporation instituted proceedings under the act of March 16, 1889, in the superior court of the county of San Diego, state of California (that being the county in which the district was at that time situated), for the purpose of obtaining a judicial examination, approval, and confirmation of the proceedings providing for and authorizing the issue and sale of the bonds; and that such proceedings resulted in a decree of the superior court of San Diego county, entered on the 22d day of June, 1892, adjudging "that said San Jacinto & Pleasant Valley Irrigation District was duly organized by and under the direction of the board of supervisors of the said county of San Diego; that the first board of directors of said irrigation district, consisting of the said petitioners, was duly elected and duly qualified as such, and that all of the proceedings of said board of supervisors of said county under and by virtue of which the said irrigation district was organized and the said first board of directors of said irrigation district was elected be, and the same is hereby, approved and confirmed"; and further decreeing "that all the proceedings had by or under the authority of the said board of directors for the issuance of the bonds of said irrigation district to the amount of three hundred and fifty thousand dollars ($350,000.00), including in said proceedings the estimate made by the said board of directors mentioned in said petition of the amount of money necessary to be raised for the purpose of constructing the necessary irrigation canals and works and the acquisition of the necessary rights and property therefor, and otherwise carrying out the provisions of the act of the Legislature under which said irrigation district is organized; and also including in said proceedings the election mentioned in said petition, which was called and held upon the question whether the bonds of said irrigation district in the amount aforesaid should be issued by said irrigation district; and also including in said proceedings the order of the board of directors that the bonds of said irrigation district in the amount aforesaid be issued by the said board of directors in the manner and form as in said order provided and as prescribed by law be, and the same are hereby, approved and confirmed"; and further adjudging "that the San Jacinto & Pleasant Valley Irrigation District ever since its organization as aforesaid has been, and now is, a duly and legally organized irrigation district, and that it has and possesses full power and authority to issue and sell from time to time the bonds of said irrigation district to the aforesaid amount of $350,-000." The bill alleges that that decree has never been appealed from, vacated, or set aside, and is in full force and effect.

It is next alleged that certain of the bonds were sold by the irrigation district, and that the money derived therefrom was by the board of directors of the district used in the construction of canals, ditches, rights of way, and other necessary and proper works within the boundaries of the district, in order that the lands therein might be irrigated, and also for the purchase of water rights, lands, rights of way, water-bearing lands, flumes, pipe lines, and interests in other corporations

owning and possessing water rights, water-bearing lands, flumes, pipe lines, and ditches, without the boundaries of the district; all of which were necessary and essential to the proper carrying out of the purposes for which the district was organized. It is alleged that the complainant is a creditor of the defendant district, being the owner of a certain judgment rendered against it in this court for the sum of $2,937.14, which judgment remains wholly unpaid, and upon which execution was duly issued and returned by the marshal wholly unsatisfied; that the judgment was obtained upon unpaid and past-due coupons upon certain of the said bonds held and owned by the complainant. It is alleged upon information and belief that the defendant corporation is the owner of a large amount of real and personal property, canals, ditches, rights of way, water-bearing lands, and other lands, canals, pipe lines, interests in other corporations owning and possessing water-bearing lands, flumes, pipe lines, and ditches outside of the boundaries of the district, the exact description of which the complainant is unable to give for reasons afterward set out. It is alleged that from the date of its organization until the early part of the year 1899 the defendant corporation carried on its business of acquiring water and water rights, and supplying the same to lands within the district, on which last-mentioned date it became, and has since been, insolvent; that for several years prior to 1899 the defendant corporation failed and neglected to raise by assessment upon the lands of the district the full amount of money required for the purposes of paying interest upon the bonds and for the general and operating expenses of the district, and prior to that year it issued a large number of warrants, and promises to pay on demand, which warrants were issued for the purpose of paying the running and operating expenses of the district, salaries of officers, and other debts contracted by the district, and which it authorized and directed to be used and received by the district in payment for the use of water furnished by it to irrigators therein, for which reason, it is averred, the corporation defendant did not receive money for the use of the water, "and because thereof, and because of the failure of the said corporation to levy the assessments aforesaid, the said corporation defendant and the officers thereof, failed to pay the interest on said bonds, and failed to pay the coupons attached to the bond owned and held by your orator aforesaid." It is alleged that the amount of land embraced within the boundaries of the district is 18,000 acres, the assessed value of which upon the last assessment roll of the county of Riverside, Cal., does not exceed the total sum of $100,000, and that the market value of such lands does not exceed $125,000; that the bonded indebtedness of the district for bonds issued and outstanding amounts to $225,750; that the accrued interest thereon, represented by the coupons, amounts to about $60,000; that there is further and other outstanding indebtedness of the defendant corporation amounting to the sum of $10,000; and that, if all the lands embraced within the district were sold at their full market value, there would be realized therefrom a sum wholly insufficient to pay the indebtedness of the defendant corporation. It is next averred that in July, 1899, the board of directors, the treasurer, assessor, and collector of the defendant district, abandoned their duties

and responsibilities as such officers, and permitted adverse parties to seize, take hold of, and appropriate to their own use, fraudulently, and without any consideration, all the lands, water rights, ditches, flumes, and other property of the district lying without its boundaries, and to hold the same adversely, and to convert the same to their own use, to the detriment of the residents of the district, and to the irreparable injury of the complainant and other bondholders similarly situated; that all of said land, water rights, ditches, flumes, and other property owned and possessed by the district, and lying without the boundaries thereof, have been and now are wrongfully appropriated and held adversely by strangers who have wrongfully and unlawfully seized and appropriated the same to their own use, and are selling the waters to consumers thereof outside of the boundaries of the district, and wrongfully appropriating and converting to their own use all the moneys collected as tolls therefrom; that such parties so wrongfully appropriating and converting the assets of the defendant district without its boundaries have so collected in excess of $50,000, and that the board of directors of the district have never at any time since July, 1899, demanded the payment of the same, or made any attempt to collect it; that ever since July, 1899, the board of directors of the district have failed in the performance of all of their duties, have held no meetings, have failed to levy or cause to be levied any assessments for the purpose of paying the interest on the bonds issued by the district, or any part thereof; that they have failed to collect and keep any assets of the district, and have permitted and do still permit strangers and hostile interests to wrongfully appropriate and convert the property of the district, and to collect the tolls from the sale of water belonging thereto, and to destroy and render valueless its ditches and flumes; that a majority of the board of directors of the defendant district have removed their residences therefrom; that the secretary, treasurer, assessor, and collector, have removed their residences and that the board of directors ever since July, 1899, have failed to keep any office or place for the transaction of business in the district, and have allowed and do now allow all the papers, files, books, maps, stock, deeds, evidences of title, and other memoranda and records pertaining to the district to remain in the hands of strangers and parties having no interest in the same, and have taken no steps to take possession thereof, or preserve the same from loss; that the books, maps, papers, and contracts necessary to enable the complainant to ascertain what real and personal property belongs to the defendant corporation, to give a description thereof, are locked in the safe of the defendant corporation, which safe is in the hands of strangers, and the complainant is unable to obtain access thereto; that he has demanded of the president of the board of directors of the defendant corporation that the vacancies upon the board of directors be filled, and meetings be held, and that steps be taken to recover possession of the real and personal property of the district, and that an assessment upon the real property of the district to pay the coupons of the complainant be levied —all of which demands have been refused; that the last assessment levied was paid only by a small portion of the landowners of the

district, and that a considerable portion of the land assessed was sold for nonpayment thereof, and, there being no bidders therefor, was bid in and sold to said district, and that the assessment and sale thereof failed to bring money into the treasury sufficient to pay the indebtedness thereof; that, if an assessment should be levied upon the real property within said district, the same would not be paid, and would not bring any money into the treasury of the said corporation, and would not result in the raising of any money to pay the said indebtedness of the district, or any part thereof.

It was shown in opposition to the application for the appointment of a receiver, among other things, that subsequent to the aforesaid confirmatory decree of the superior court of San Diego county, the superior court of Riverside county (then embracing the lands covered by the irrigation district in question), in an action brought by the state of California upon the relation of a taxpayer, entered a judgment declaring that the defendant district was never legally organized, and adjudging each and all of the bonds issued by it illegal and of no effect. It is not necessary at this time to consider the effect of these contrary judgments. It will be seen from the provisions of the statute under which the bonds upon which the complainant's judgment was obtained were issued, as well as from the averments of the bill itself, that assessments upon the lands embraced by the district was the mode provided by law for the payment of both principal and interest of the bonds. The complainant acquired his bonds with that knowledge, for it was a matter of public law. If, as claimed on his behalf, the bonds held by him are valid, they were payable in the mode provided by the law under which they were issued, and, if the proper officers refused or neglected to levy the proper and necessary assessments, the remedy provided by law was mandamus to compel them to do so. In Heine v. The Levee Commissioners, 19 Wall. 655, 657, 22 L. Ed. 223, the Supreme Court said:

"It has been decided in numerous cases founded on the refusal to pay corporation bonds that the appropriate proceeding was to sue at law, and by a judgment of the court establish the validity of the claim and the amount due, and by the return of an ordinary execution ascertain that no property of the corporation could be found liable to such execution and sufficient to satisfy the judgment. Then, if the corporation had authority to levy and collect taxes for the payment of that debt, a mandamus would issue to compel them to raise by taxation the amount necessary to satisfy the debt. Unless, then, there is some difficulty or obstruction in the way of this common-law remedy, chancery can have no jurisdiction."

But neither the fact that the remedy at law by mandamus for levying and collecting taxes, if resorted to, has proved ineffectual, nor the fact that no officers can be found to perform the duty of levying and collecting them, can justify a court of equity in undertaking to do so by means of a receiver. Thompson v. Allen County, 115 U. S. 550, 6 Sup. Ct. 140, 29 L. Ed. 472, and cases there cited. Nor does the mere fact that a party finds himself unable to collect his debt by proceedings at law make it the duty of a court of equity to devise some mode by which it can be done. The case of Heine v. The Levee Commissioners, supra, was a bill in equity to enforce collection of taxes where no officers could be found whose duty could be enforced by mandamus.

"There does not," said the court, "appear to be any authority founded on the recognized principles of a court of equity on which this bill can be sustained. If sustained at all, it must be on the very broad ground that, because the plaintiff finds himself unable to collect his debt by proceedings at law, it is the duty of a court of equity to devise some mode by which it can be done. It is, however, the experience of every day and of all men that debts are created which are never paid, though the creditor has exhausted all the resources of the law. It is a misfortune, which, in the imperfection of human nature, often admits of no redress. The holder of a corporation bond must, in common with other men, submit to this calamity, when the law affords no relief."

The court added that the exercise of the power of taxation belonged to the Legislature, and not to the judiciary. There the Legislature had delegated the power to the levee commissioners, and the court said:

"If that body has ceased to exist, the remedy is in the Legislature either to assess the tax by special statute, or to vest the power in some other tribunal. It certainly is not vested, as in the exercise of an original jurisdiction, in any federal court. * * * It is not only not one of the inherent powers of the court to levy and collect taxes, but it is an invasion by the judiciary of the federal government of the legislative functions of the state government." Page 661, 19 Wall., 22 L. Ed. 223.

In Barkley v. Levee Commissioners, 93 U. S. 258, 23 L. Ed. 893, in speaking of the power to compel by mandamus municipal officers to perform the ministerial duty of levying proper taxes, where there were no such officers, it was said:

"The truth is that a party situated like the present petitioner is forced to rely on the public faith of the Legislature to supply him a proper remedy. The ordinary means of legal redress having failed by lapse of time, and the operation of unavoidable contingencies, it is to be presumed that the Legislature will do what is equitable and just; and in this case legislative action seems to be absolutely requisite."

In the case of Walkley v. City of Muscatine, 6 Wall. 481, 18 L. Ed. 930, the complainant, Walkley, had procured judgment against the city of Muscatine for interest on bonds of the city, execution had been returned nulla bona, the mayor and aldermen had refused to levy a tax for the payment of the judgments, and had used the annual tax for other purposes, and paid nothing to the plaintiff. Walkley then filed his bill in equity praying a decree that the mayor and aldermen be compelled to levy a tax and appropriate so much of the proceeds as might be necessary to pay his judgments. The Supreme Court held that the remedy was by mandamus at law, and said, among other things: "We have been furnished with no authority for the substitution of a bill in equity and injunction for the writ of mandamus;" and added that "a court of equity is invoked as auxiliary to a court of law in the enforcement of its judgments in cases only where the latter is inadequate to afford the proper remedy." 6 Wall. 483, 484, 18 L. Ed. 930. By such inadequacy of the remedy at law, the same court said in the subsequent case of Thompson v. Allen County, 115 U. S. 554, 6 Sup. Ct. 142, 29 L. Ed. 472, is meant "not that it fails to produce the money—that is a very usual result in the use of all remedies—but that in its nature or character it is not fitted or adapted to the end in view."

In the present case the appropriate remedy for the end in view was mandamus; for it was the remedy afforded by law to compel the officers to levy the assessments provided for by statute for the payment of the principal and interest of the bonds in question. And no other mode or manner of payment was provided by the statute for that purpose. In the case of Meriwether v. Garrett, 102 U. S. 472, 26 L. Ed. 197, the Legislature of Tennessee had repealed the charter of the city of Memphis and abolished the city organization at a time when there were taxes assessed and uncollected amounting to several millions of dollars, and debts of the city to a much larger amount. Some of these taxes had been levied under compulsion of writs of mandamus from the Circuit Court of the United States. A bill in chancery was filed in that court by some of these creditors, praying the appointment of a receiver, who should take charge of all the assets of the city of Memphis, collect these taxes, and pay them over to the creditors, and generally administer the finances of the extinct city as a court of equity might administer the insolvent estate of a dead man. The decree of the Circuit Court granting relief according to the prayer of the bill was reversed by the Supreme Court, and the bill directed to be dismissed.

Upon careful consideration, I am of the opinion that the principle running through the cases cited forbids the appointment of a receiver in the present case. An order will be entered vacating that entered herein March 28, 1904, and denying the application for the appointment of a receiver.